IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


GEORGE HULEN SORRELLS                                    PLAINTIFF

           v.                    Civil No. 05-5075

SHERIFF DANNY HICKMAN;
DR. LYNN MAYO; JASON DAY,
Jail Administrator; and LANCE
COTTRELL, Jailer                                         DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

     George Hulen Sorrells brings this pro se civil rights action pursuant to 42 U.S.C. § 1983. While he was incarcerated at the Boone County Detention Center, Sorrells contends his federal constitutional rights were violated in the following ways: (1) he was subjected to unconstitutional conditions of confinement; (2) he was denied access to a law library; (3) he was denied adequate medical care; and (4) defendants' failed to protect him from attack by a fellow inmate.

     On January 26, 2006, defendants filed a motion for summary judgment (Doc. 27). On March 23, 2006, the undersigned entered an order (Doc. 31) directing the plaintiff to complete, sign and return an attached questionnaire that would serve as his response to the motion for summary judgment. On April 25, 2006, plaintiff's response to the court's questionnaire (Doc. 32) was filed. The case is currently before the undersigned for the issuance of a report and recommendation on the summary judgment motion.

-1-

# I. BACKGROUND

Sorrells was arrested and booked into the Boone County Detention Center (BCDC) on December 20, 2004, on charges of theft of property greater than $2,500 and aggravated robbery. *Plaintiff's Response* (hereinafter *Resp.*) at ¶ 1. He was incarcerated solely because of the pending criminal charges. *Id.*

Although defendants maintain that when Sorrells was booked in he was provided with a copy of the inmate rules and regulations which covered facility management, phone calls, personal property, detention center property, cell assignment, care of inmate living areas, personal cleanliness, conduct, visitation, mail, books, tobacco, jail phones, commissary, toilet paper, Sorrells denies that he was ever given a copy of these rules and regulations. *Resp.* at ¶ 3(A). We note that there is a place at the end of the second page of these rules and regulations for the detainee's name to be printed and the date to be placed. *See Defendants' Exhibit* (hereinafter *Defts' Ex.*) 1 at page 3. These areas are blank on the exhibit submitted to the court. *Id.*

On December 23, 2004, Sorrells was taken to the emergency room at the North Arkansas Regional Medical Center after he told jailers that he needed Vicodin and had been on it continually. *Resp.* at ¶ 4(A). Medical personnel noted Sorrells had no problem walking and a note was also made that he told several different stories regarding who prescribed his medication. *Defts' Ex.* 2 at page 2. A note was also made that Sorrells requested that a therapeutic rub be ordered so he could use a tube of cream he had in his personal effects. *Defts' Ex.* 2 at page 3; *Resp.* at ¶ 4(C).

AO72A
(Rev. 8/82)

Sorrells reported having a ruptured disc, suffering from depression, and stated he had been scheduled for a colonoscopy prior to his incarceration. *Resp.* at ¶ 4(D). He reported being on Celebrex, Lortab, Soma, Previcid, and Zoloft. *Id.* at ¶ 4(E). Sorrells was given a prescription for Flexeril. *Id.* at ¶ 4(F). No other prescription medication was ordered. *Defts' Ex.* 2. However, Sorrells maintains he was supposed to be issued Ibuprofen 800 mg. for pain and inflammation. *Resp.* at ¶ 4(G).

On December 24, 2004, Sorrells submitted a grievance asking why the Ibuprofen 800 that was prescribed at the hospital did not make it to his medical sheet. *Resp.* at ¶ 5(A). Sorrells stated two officers had been standing there when it was prescribed. *Id.* at ¶ 5(B).

In response, Sorrells was told he would be given Ibuprofen 800 mg. until the jail doctor came the following week. *Resp.* at ¶ 5(C). He was also told that in accordance with Dr. Morris' instructions he would be given Ranitidine twice a day until seen by the jail doctor. *Id.* Finally, he was told that they would consider his request for baby lotion but he would not receive it at that time. *Id.*

On December 27, 2004, Sorrells submitted a request for medical attention. *Resp.* at ¶ 6(A). He stated he was only receiving the minimum for pain even after the emergency room doctor saw his MRI's. *Id.* He stated Ibuprofen had been around since the 1970's. *Id.* He indicated he had been on Naproxen for years and it caused his ulcers and acid reflux. *Id.* He indicated the Ibuprofen was killing his stomach. *Id.* He also indicated he needed something for his arthritis. *Id.* In response, Sorrells was told that his request would be faxed to the doctor. *Resp.* at ¶ 6(B).

-3-

AO72A
(Rev. 8/82)

Sorrells submitted a grievance on December 27, 2004, in which he complained of noise pollution coming from the adjoining cells. *Resp.* at ¶ 7(A). He indicated he had told the two inmates to pipe it down numerous times. *Id.* In response, he was told that the problem would be taken care of. *Id.* at ¶ 7(B). Sorrells indicates the problem was resolved when one of the detainees was transferred to a single cell. *Id.* at ¶ 7(C).

On December 30, 2004, Sorrells submitted a medical request. *Resp.* at ¶ 8(A). He indicated he wanted to get on an arthritis medication. *Id.* He stated he had been on Vioxx, Naproxen, Anaproxen, and Celebrex for nine years. *Id.* In response, a note was made that Sorrells was put on Dicolofenac, a combination anti-inflammatory/pain reliever on December 29, 2004. *Id.* at ¶ 8(B). Sorrells started receiving Diclofenac on December 29, 2004. *Id.* at ¶ 8(C).

On December 30, 2004, Sorrells submitted a grievance in which he stated he wanted access to the law library. *Resp.* at ¶ 9(A). He stated he had not received a lawyer as far as he knew. *Id.* Instead, he stated Mr. Buckner had only acted as a stand-in at his arraignment. *Id.* He also stated that he had been held in the Tarrant County Jail for a period of time for the Boone County Sheriff's Office and had not been able to make a phone call since he had been incarcerated. *Id.* at ¶ 9(B).

Sorrells sought access to the law library in connection with the criminal charges pending against him. *Resp.* at ¶ 9(C). On December 31st, Jason Day, the jail administrator, responded stating that they did not have a law library. *Id.* at ¶ 9(D). If Sorrells needed legal information, he was told to contact his attorney or the public defender's office and they would be up. *Id.* Day

-4-

said the jail would make copies of whatever the attorney brought for Sorrells. *Id.* If Sorrells

needed to come up front and call, Day stated they would be glad to do that. *Id.*

When Sorrells appeared in court on the criminal charges, an attorney was appointed to

represent him. *Resp.* at ¶ 9(E). However, Sorrells states his attorney would not return his calls

or come visit him at the jail until Sorrells wrote the Judge informing him of the problem. *Id.*

Sorrells was then able to get his questions answered. *Id.* at ¶ 9(F).

When asked whether he missed any deadlines for filing documents with the court because

he did not have access to a law library, Sorrells responded yes. *Resp.* at ¶ 9(H). He then

indicated he was unable to file a motion for change of venue and was not able to subpoena his

twin brother to court as a material witness. *Id.* at ¶ 9(H) & ¶ 9(I). However, Sorrells discussed

the change of venue with his attorney who did not believe the Judge would allow it. *Resp.* at ¶

9(F). With respect to the subpoena, Sorrells indicates his attorney was lazy and unconcerned

about his situation. *Id.* at ¶ 9(H). Sorrells also indicates his attorney did not allow him to be seen

by a psychiatrist to establish the amount of mental stress Sorrells had been under. *Id.*

Sorrells was able to send and receive legal mail. *Resp.* at ¶ 9(J). He could also use a

phone to contact his attorney or have a jailer contact his attorney. *Id.* at ¶ 9(K). His attorney

could visit him in person at the BCDC. *Id.* at ¶ 9(L).

On January 2, 2005, at 2105 (9:05 p.m.) while Lance Cottrell was making a "key turn"

hall porter Bobby Kyzer informed Cottrell that Sorrells was having some problems. *Resp.* at ¶

10. Cottrell came over and asked Sorrells what the problem was. *Id.* Sorrells told Cottrell he

needed a blood pressure check. *Id.*

AO72A
(Rev. 8/82)

Cottrell called the doctor and told him that Sorrells was having a headache, ringing in his ears, his blood pressure was surging, and his face was flushing and that an hour later it was pale. *Resp.* at ¶ 11. Cottrell also told the doctor that Sorrells was waking up at night out of breath like he had run a race. *Id.*

The doctor told Cottrell that it sounded like Sorrells was having an anxiety attack. *Defts' Ex.* 9 at page 52. The doctor stated that Sorrells would be alright until morning. *Id.* Cottrell was instructed to bring Sorrells to visit the doctor in the morning or call the doctor and have him come by the jail and check Sorrells in the morning. *Id.*

On January 2, 2005, Sorrells submitted a medical request. *Resp.* at ¶ 14(A). He stated he was having headaches, his ears were ringing, his blood pressure was surging, his face was flushing and then going pale, and he had been waking up at night with his breathing out of control. *Resp.* at ¶ 14(A). Sorrells submitted this request when Cottrell came to check him at 9:05 p.m. *Id.* at ¶ 14(B).

Sorrells was examined by Nurse Practitioner Mayo who noted that Sorrells had no previous diagnosis of hypertension. *Resp.* at ¶ 15. Mayo also noted that Sorrells reported back problems that were not surgical in nature. *Id.* Sorrells requested the same narcotic pain medications he had requested at the emergency room. *Id.* In this regard, Sorrells notes that he simply asked for medications that he knew were pain relievers. *Id.* If there were other non-narcotic pain relievers with would work similarly, he was willing to try. *Id.*

In accordance with the instructions of Dr. Maris, Sorrells was prescribed Darvocet and Celebrex and his blood pressure was to be checked daily. *Resp.* at ¶ 16. Sorrells received the Darocet and Celebrex on the prescribed basis. *Id.* at ¶ 17(A). Sorrells indicates there were days

-6-

his blood pressure was not checked because the officers were too busy or simply forgot. *Id.* at ¶ 17(B). Sorrells states there were times his reminders were ignored as if he were causing unwanted work. *Id.*

On January 3, 2005, at 8:10 p.m. when Cottrell was handing out medication, he noticed Sorrells was writing a grievance with a regular pen and not an issued flex pen. *Resp.* at ¶ 18(A); *Defts' Ex.* 1 at page 11. Cottrell told Sorrells he was sorry but he would have to take that pen. *Id.*

According to Cottrell, he stated he would give Sorrells a flex pen. *Defts' Ex.* 1 at page 11. Sorrells asked if Cottrell would give him a different pen he could actually write with. *Id.* Cottrell explained that detainees are only allowed to have flex pens.[1] *Id.*

Sorrells face got really red and he jammed the pen into the table a couple of times. *Resp.* at ¶ 18(C). On the third try, the pen snapped. *Id.* Cottrell threw the pieces in the trash and Sorrells told Cottrell: "If you keep it up, I'm going to buck." *Id.*

According to Sorrells, everyone had alternative pens because the flex pens were not comfortable to use. *Resp.* at ¶ 18(A). Sorrells indicates he has mild arthritis in his wrist, hands, and fingers, and the flex pens were not ergonomically friendly. *Id.* He maintains Cottrell could have simply ignored it. *Id.*

Sorrells also maintains he asked Cottrell for a pen since his was being confiscated. *Resp.* at ¶ 18(B). Sorrells maintains he was told he would have to pay for a pen and would receive it

---

[1]According to Sorrells, a flex pen is approximately three inches long and about the thickness of a normal pen but has a hollow soft tubing around the ink cartridge. *Resp.* at ¶ 18(D).

AO72A
(Rev. 8/82)

on commissary day. *Id.* Sorrells states this meant he would have to wait three to ten days for a pen. *Id.* Sorrells maintains this is what caused his outburst and him to break the pen. *Id.*

On January 13, 2005, Sorrells submitted a grievance in which he stated his blood pressure had continued to be borderline stroke level and he had continued to have headaches, pain behind his right ear and down his neck, and that morning he stated his nose had started bleeding. *Resp.* at ¶ 19(A). Sorrells indicated he believed he needed to get a handle on the problem. *Id.* He stated he did not believe it was healthy being locked in his cell so many hours a day without being allowed to get out to work or exercise. *Id.* He also complained about his diet being high in sodium and carbohydrates. *Id.*

Sorrells indicates the cell he was assigned to was approximately ten foot by twelve foot in size. *Resp.* at ¶ 19(B). He states there were four or five detainees in the cell and they were on lock-down from December 21, 2004, until February 20, 2005. *Id.* The cell had four bunks, an inoperable sink, a toilet, and a picnic table. *Id.* Occasionally, Sorrells indicates they were allowed into the drunk tank which was being used as a day-room. *Id.* They were not allowed outside until late February, mainly because of the weather. *Id.*

They were allowed out of the cells to shower three times a week to shower, to get water between showers to shave, and to get water for snacks or coffee. *Resp.* at ¶ 19(B). After he became a hall porter, Sorrells indicates he was able to clean the halls, distribute clothing and supplies, and give hot and cold water to cell 3 and 8 for detainees. *Id.*

Sorrells was seen by Nurse Practitioner Mayo on January 13, 2005. *Resp.* at ¶ 20. He was diagnosed with borderline hypertension, anxiety, and isolated epistaxis. *Id.* He was told to

AO72A
(Rev. 8/82)

use Vaseline on his nasal membranes, perform aerobic exercise in his cell, and have his blood pressure monitored. *Id.* Mayo prescribed no mental health medications at that time. *Id.*

On January 17, 2005, Sorrells stated he had only been to the TV room twice a week and had received yard call three times. *Resp.* at ¶ 21(A). He stated that he needed exercise to keep his stress and anxiety levels down. *Id.* Day responded that he would look into the matter. *Id.* at ¶ 22.

Sorrells indicates he would do exercises such as push-ups, sit-ups, crunches, back arm extensions, etc., in his cell. *Resp.* at ¶ 21(B). Other exercises he could not do because of the echo of sounds which made its way off the walls to the front desk. *Id.*

When asked if he suffered any physical injury as a result of not having enough exercise, Sorrells responded that he had. *Resp.* at ¶ 21(C). He indicated he had chronic hypertension, shortness of breath, and occasional neck pain. *Id.*

On January 17, 2005, Sorrells submitted a grievance stating that he hadn't gotten hygiene products the prior week. *Resp.* at ¶ 23. He indicated he understood someone had forgotten to order the supplies. *Id.* In response, Sorrells was told the products would be in that day. *Id.* at ¶ 24(A).

Sorrells indicates inmates normally received facial soap and shampoo. *Resp.* at ¶ 24(B) & ¶ 24(C). There were periods of time when Sorrells was completely out of hygiene products. *Id.* at ¶ 24(D). This happened approximately three times and lasted for a few days. *Id.* Sorrells isn't sure if you could buy such products from the commissary or not. *Id.* However, he states the only inmates who could receive such items from family members were the trustees. *Id.* Inmates were allowed to shower on Mondays, Wednesdays, and Fridays. *Id.* at ¶ 24(E).

AO72A
(Rev. 8/82)

Between showers, Sorrells indicates he usually didn't have enough hygiene products left to wash his body. *Resp.* at ¶ 24(F). Additionally, he states the cells he was in didn't have enough water to wash before meals and activities during the day. *Id.* According to Sorrells, the water in cells 3 and 8 was broken from December of 2004 to October of 2005. *Id.* at ¶ 24(G).

On January 17, 2005, Sorrells submitted a grievance in which he complained about his youngest daughter, who was ill, not having been allowed to visit him. *Resp.* at ¶ 25. In response, Sorrells was told his daughter had not been turned away. *Defs' Ex.* 1 at page 16. Instead, he was told his sister-in-law had informed Officer Gibson that Sorrells' daughter wasn't coming because she didn't have time. *Id.*

According to Sorrells, his sister-in-law didn't have time to come on Monday because his daughters would be on their way back to Springhill, Louisiana. *Resp.* at ¶ 26. However, Sorrells maintains his daughters were turned away by Deputy Silvia, after contacting Jason Day, on Saturday. *Id.* Sorrells indicates Silvia told him about the incident. *Id.*

On January 18, 2005, at 11:55 a.m. Officer Randall Gibson heard Inmate Christopher Branning in cell 3 stated "I am an advocate for suing Boone County." *Defs' Ex.* 1 at page 17. At about 12:45 Inmate Daniel Lundy asked when they were going to get to order commissary. *Defs' Ex.* 1 at page 17. Gibson responded that he got only one day a week to do commissary and that was today but he was too busy to do it right then. *Id.* Branning stated "thank you Randy" and looked directly at Sorrells. *Id.* Gibson then explained that commissary was not a right but a privilege. *Id.*

-10-

On February 17, 2005, Officer Flowers and Officer Rhine heard a commotion in the drunk tank. *Resp.* at ¶ 29. When they opened the door, they saw Sorrells and Inmate Rickie Freeman fighting. *Id.*

Sorrells and Freeman were wrestling and pushing each other and the officers ordered them to stop. *Defts' Ex.* 1 at page 18. Sorrells and Freeman did not stop. *Id.* Rhine ordered Sorrells to stop a second time and this time he and Freeman separated. *Id.*

According to Sorrells, he was not paying attention to the officers and was trying to keep Freeman off of him. *Resp.* at ¶ 30. Sorrells maintains the guards just sat at the door and watched as Sorrells and Freeman "swapped licks." *Id.* After Sorrells tried to break away from Freeman, Sorrells indicates he was struck with some cheap shots so Sorrells began to strike Freeman again. *Id.* Sorrells states he told the officers to do their jobs and get Freeman off of him. *Id.*

Rhine stepped between Sorrells and Freeman and Sorrells began "mouthing Freeman" and the two started arguing. *Resp.* at ¶ 31. Rhine instructed them both to shut their mouths. *Id.* Freeman was taken back to his own cell and Sorrells was taken to see the Nurse Practitioner Mayo. *Resp.* at ¶ 32. Mayo noted Sorrells had sustained injuries to his face and testicles and should be taken to the emergency room. *Id.*

Prior to the altercation on February 17th with Freeman, Sorrells had never had any problems with Freeman. *Resp.* at ¶ 33(A). Sorrells had not put Freeman on his enemy list or notified the defendants in anyway that he believed Freeman might harm him in some way. *Id.* at ¶ 33(B).

Sorrells was placed in the drunk tank with Freeman by Corporal Flowers. *Resp.* at ¶ 33(C). Freeman and Sorrells were in the cell together for only a minute or two before the

altercation occurred. *Id.* at ¶ 33(D). Sorrells did not protest being placed in the drunk tank with Freeman. *Id.* at ¶ 33(E). Sorrells was not afraid of Freeman. *Id.*

Sorrells was taken to the emergency room at North Arkansas Regional Medical Center and complained of nasal pain and bleeding, left flank pain, and pain in the gonads. *Resp.* at ¶ 33(F). X-rays taken of Sorrells' facial bones, nose, and chest were all normal. *Defts' Ex.* 2 at page 15. Sorrells abrasions were cleaned and he was given an injection and a prescription for Keflex and Darvocet. *Resp.* at ¶ 33(H).

Freeman was interviewed by Day on February 18th. *Defts' Ex.* 1 at page 20. Freeman stated that Sorrells came at him and he defended himself. *Id.*

Sorrells also spoke with Day on February 18th about the fight. *Resp.* at ¶ 35. Sorrells and Freeman had been placed in the drunk tank for doctor call. *Id.* Sorrells told Day that Freeman asked if Sorrells had a problem with him and Sorrells replied he didn't even know who Freeman was. *Id.* At that point, Sorrells stated Freeman attacked him. *Id.* Sorrells was told it would be looked into and Freeman was going to be charged. *Id.*

On February 18, 2005, Cory Mathison gave a statement in which he stated he had asked Sorrells what caused the fight between him and Freeman. *Defts' Ex.* 1 at page 22. Mathison indicated Sorrells stated Freeman had asked if there was a problem and he replied that he didn't even know him. *Id.* Sorrells then told Mathison that Freeman stood up and Sorrells put him in and headlock and was choking him. *Id.* When Sorrells came back to the jail after having been seen at the hospital, Mathison indicates Sorrells stated he would kill Freeman himself. *Id.*

According to Sorrells, he asked Freeman why he had a problem with Sorrells. *Resp.* at ¶ 36. Freeman didn't reply. *Id.* Instead, Sorrels states Freeman merely kicked his shoes off and

-12-

tried to rush Sorrells. *Id.* After a couple of blows between them, Sorrells states he used his size

to subdue Freeman in a headlock. *Id.* Somewhat knowing Freeman's background, Sorrells states

he knew he would either have to choke Freeman or knock him out. *Id.* If Sorrells hadn't

received the facial lacerations from a head butt or the crushing of his right testicle, he states he

would not have held a grudge. *Id.* Sorrells indicates he only told Mathison if Sorrells had a

chance he would give Freeman a beating he wouldn't forget. *Id.*

Inmate Chad Suddeth also gave a statement. *Defts' Ex.* 1 at page 23. Suddeth stated that

Sorrells indicated that he had put Freeman in a headlock and choked him after he asked Sorrells

if he had a problem. *Id.* Suddeth also indicated Sorrells stated that he was going to kill Freeman

himself. *Id.* Suddeth also said that Sorrells got up and walked around in the cell #10 although

when the guards came he pretended that he could barely move. *Id.*

Both Suddeth and Mathison were in the same cell as Sorrells on February 18, 2005.

*Resp.* at ¶ 39. Sorrells maintains Suddeth and Mathison are best friends with Day. *Resp.* at ¶

37. Sorrells asserts they are trying to make him look like a bad guy when actually he was only

trying to defend himself. *Id.* Moreover, Sorrells indicates Suddeth will say anything to discredit

him. *Resp.* at ¶ 38.

On February 19, 2005, Sorrells submitted a medical request asking for an upgrade in his

pain medication. *Resp.* at ¶ 40. He said that after his confrontation on February 17, 2005, he

needed something stronger to relax and be comfortable. *Id.*

In response, Sorrells was told the doctor would be informed of his request. *Resp.* at ¶

41(A). Sorrells maintains he was not seen by the doctor in response to this request and his

-13-

medication was not changed. *Id.* at ¶ 41(B). Sorrells also indicates he had problems getting his ice pack for his testicle pain. *Id.*

On February 19, 2005, Sorrells submitted a grievance asking to be brought up front to call his wife and inform her about his altercation with Freeman and his health status. *Resp.* at ¶ 42. He stated he had no control over what happened in the drunk tank and that psychotics should not be put in with the general population. *Id.* Sorrells stated Freeman had a known history of bad behavior and being on medication. *Id.*

Day responded that he was not aware of Freeman's history. *Resp.* at ¶ 43. He also stated Sorrells was under investigation because it was not clear who started the fight. *Id.* Finally, he stated Sorrells had been put in the drunk tank because he was going to doctor call. *Id.* He stated Sorrells should have informed them if he had a problem with Freeman and they could have avoided the situation. *Id.* Sorrells was allowed to call his wife and inform her of the fight. *Resp.* at ¶ 47.

On February 21, 2005, Day interviewed Inmate Bobby Kyzer about the fight between Sorrells and Freeman. *Resp.* at ¶ 44. Sorrells and Kyzer had been hall porters together in the back. *Id.* Kyzer said the reason for the fight was Trustee Chad Suddeth had been bringing Freeman cigarettes and Sorrells told on them. *Id.*

Kyzer stated that no one knew there was a problem until after the fight. *Defs' Ex.* 1 at page 26. Kyzer also indicated Suddeth had been smoking dope but he tested clean. *Id.*

According to Sorrells, Kyzer told Day that Suddeth and Cottrell were involved. *Resp.* at ¶ 45. Cottrell then threatened to charge Kyzer and Sorrells with felonies for bringing in dope and

cigarettes. *Id.* At this point, Sorrells states he pulled Cottrell aside and pointed out the cell the smoke was coming from. *Id.*

According to defendants, Sorrells was brought to Day's office and Kyzer told Sorrells that the jail had no idea of the problem. *Resp.* at ¶ 46. Sorrells states Kyzer told the whole story to Day who indicated he would have to fire Cottrell for allowing detainees to use and instigate situations. *Id.* Sorrells asserts Day indicated he would have to go home and pray about all he had learned and make a decision the following day. *Id.* After Sorrells went back to his cell, he states Suddeth was taken up front and told Kyzer's story. *Id.*

On February 21, 2005, at 11:34 a.m., Officer Randall Gibson was informed by two inmates that a wrench had been taken out of the back and was going to be used to disassemble locking devices within the jail so that Kyzer could get into the female group to see his girlfriend, Shannon Sanders. *Defts' Ex.* 1 at page 27. Kyzer wanted a screwdriver also. *Id.*

It was reported that Sorrells was helping in the attempt. *Defts' Ex.* 1 at page 27. Sorrells, however, states this is the first he has heard about this incident. *Resp.* at ¶ 49.

Gibson noted that in the past letters had been read that stated Sorrells and Kyzer would escape when they were extradited to Florida together. *Defts' Ex.* 1 at page 27. Sorrells states he is not being extradited to Florida. *Resp.* at ¶ 50. He indicates his charges are here in Arkansas. *Id.* Sorrells states that Kyzer and Shannon are being extradited to Florida. *Id.*

On February 23, 2005, Officer John Edwards collected contraband from Shannon Sanders' cell. *Defts' Ex.* 1 at page 30. Sanders reported Kyzer had gotten her the tobacco. *Id.* When interviewed about the tobacco, Kyzer confessed. *Id.* He also stated that Sorrells had known the jail officials did not know that there was a problem between him and Freeman. *Id.*

-15-

On February 28, 2005, Officers Gibson and Edwards observed Sorrells playing basketball in the yard with other inmates. *Resp.* at ¶ 52. On February 28, 2005, Sorrells submitted a medical request. *Id.* at ¶ 53. He stated he was still in pain from the altercation with Freeman and needed an MRI and additional pain medication. *Id.* He also stated he wanted to discuss being put on anti-depressant. *Id.* Finally, he stated his testicle was still greatly compromised and he needed a medical follow-up as soon as possible. *Id.*

In response, Sorrells was told the doctor would be contacted about the MRI and told the pain medication was not working properly. *Resp.* at ¶ 54. Sorrells was seen by Nurse Practitioner Mayo that same day. *Defts' Ex.* 1 at page 33. Mayo discussed Sorrells' complaints with Dr. Maris. *Id.* It was determined no further treatment was necessary for his scrotum. *Id.* Note was made that he was being taken off Flexeril because it was not working properly and that he was taking Omeprazole which was working okay. *Id.*

On March 2, 2005, Sorrells submitted a medical request wanting to know who took him off Flexeril. *Resp.* at ¶ 56. He stated it really didn't work that well but it was all he had. *Id.* He stated he was denied stronger medication. *Id.* He stated his back still ached and burned. *Id.* He also stated he was about to go crazy with the ringing in his ears. *Id.*

In response, Sorrells was told that his request would be given to the doctor. *Resp.* at ¶ 57. Sorrells asserts he received no treatment in response to this medical request. *Id.* at ¶ 58.

On March 3, 2005, at 12:10 p.m. Kyzer was interviewed by Day about passing around a form for inmates to sign. *Defts' Ex.* 1 at page 35. The form was for Sorrells and stated that jail personnel knew that he and Freeman had problems. *Id.* Kyzer stated he signed the statement without reading it. *Id.* Kyzer also stated that Lance Cottrell knew about the problems between

-16-

Sorrells and Freeman. *Defts' Ex.* 1 at page 35; *Resp.* at ¶ 60. Kyzer stated Chad was back there "stirring up shit." *Id.*

Sorrells indicates Kyzer told him about this meeting. *Resp.* at ¶ 59. Because he wanted to keep his job, Kyzer stated he signed the statement without reading it. *Id.* Sorrells indicates he made sure everyone read what he had written because the allegations were serious in nature. *Id.*

The incident between Sorrells and Freeman occurred on a Thursday and Lance Cottrell did not work on Thursdays. *Defts' Ex.* 1 at page 35. Sorrells states this was a good way for Cottrell to proclaim his innocence by making sure the attack occurred when he was not supposed to work. *Resp.* at ¶ 61.

Kyzer was removed from his position as hall porter for lying and passing notes without authorization. *Defts' Ex.* 1 at pages 35 and 37. Sorrells believes Day was furious that Sorrells had the affidavits signed before Day had a chance to read them and that this was the reason Kyzer was removed from his position. *Resp.* at ¶ 62.

On March 4, 2005, Sgt. Rhine entered the jail and delivered a written citation for battery from Day to Sorrells. *Resp.* at ¶ 63. As Sorrells read the citation, he said to the other inmates in his cell: "They're writing me up for battery, they are just trying to cover your ass now." *Id.*

Rhine told Sorrells the tape had been reviewed and he was the one that made first contact. *Defts' Ex.* 1 at page 38. According to Rhine, Sorrells responded that Freeman was coming at him first. *Id.* According to Sorrells, he stated he was only defending himself and that Freeman had rushed him for no apparent reason. *Resp.* at ¶ 64.

-17-

On March 5, 2005, Sorrells played three games of basketball. *Resp.* at ¶ 65. Sorrells indicates he was feeling pretty good and having a good day. *Id.*

On March 9, 2005, Sorrells requested information to show the history of his inmate account to complete his § 1983 paperwork. *Resp.* at ¶ 66. Day completed the form and returned it to Sorrells. *Id.*

On March 9, 2005, Sorrells submitted a grievance complaining he had not received his $10 money order from Valentine's Day. *Resp.* at ¶ 67. He also stated that he had been charged for a doctor visit that was caused by the jailer Lance Cottrell. *Id.* He stated the jail was responsible for his medical care until he was back to his usual self. *Id.*

Sorrells was asked to explain what he meant when he said the doctor's visit was caused by Cottrell. *Resp.* at ¶ 68. He replied that Cottrell was behind the assault. *Id.* Sorrells indicated that he had robbed Cottrell's best friend's finance. *Id.* According to Sorrells, Cottrell asked him a couple of times how he could rob such a pretty girl. *Id.* Sorrells maintains Cottrell planned the assault to punish Sorrells for his part in the robbery of Country Mart. *Id.*

Day responded that Sorrells' money had been placed on his books. *Defts' Ex.* 1 at page 41. Day also stated that the tape showed that Sorrells physically started the fight. *Id.* Day stated that everyone pays a co-pay for doctor's visits and medication. *Id.* With respect to the fight, Day indicated both Sorrells and Freeman were charged. *Id.*

In response, Sorrells inquires where this video-tape is. *Resp.* at ¶ 69. He asserts that now no one can see it because of fuzziness. *Id.* Sorrells also asserts that he was charged but Freeman never was. *Id.*

-18-

On March 16, 2004, a registered dietician reviewed the BCDC's menus and found that they meet or exceeded the food guide pyramid daily recommendations in all food categories except for fruit and vegetable. *Defts' Ex.* 1 at page 42. The dietician recommended a fruit cup be served with lunch. *Id.* She noted the vegetable category was only ½ a serving below the minimum recommended range and would be difficult to achieve unless low sodium canned tomato or V-8 juice is served once a day. *Id.*

Sorrells maintains the dietician was only provided with the menu from one meal which was the biggest and best meal. *Resp.* at ¶ 70. He asserts the other meals were higher in saturated fats and starches. *Id.*

Sorrells maintains the excessive amount of starch and sodium in the diet was not good for his health especially in view of his hypertension. *Resp.* at ¶ 71. While Sorrells disagrees with the statement that he received three meals a day, he indicates he received breakfast, lunch, and supper each day. *Resp.* at ¶ 72(A). He received something to drink with each meal. *Id.* at ¶ 72(B).

However, he maintains he did not have access to drinking water between meals because the water source was inoperable. *Id.* at ¶ 72(C). We note that when asked when he had out of cell time, Sorrells responded, among other things, that he was out of the cell to collect "water for snacks & coffee." *Resp.* at ¶ 19(B).

On March 22, 2005, Sorrells submitted a grievance asking to come up front to make a phone call. *Resp.* at ¶ 73. He stated he did not receive visitors because he was from Texas. *Id.* He indicated other inmates were allowed to use the phone once or twice a week and he felt he

AO72A
(Rev. 8/82)

should be able to make a phone call a week.  *Id.*  He indicated he had a calling card up front that his family had provided.  *Id.*

In response, Sorrells was told he would be pulled up from time to time to make a phone call and use his calling card to make a phone call.  *Resp.* at ¶ 74.  However, he was told they would not do it once a week as there might be times when they were too busy.  *Id.*

Sorrells was able to send and receive personal mail.  *Resp.* at ¶ 75(A).  With the exception of a few days following the confiscation of his pen, Sorrells had basic written materials such as a pen or pencil and paper.  *Id.* at ¶ 75(B).  Although he felt he was not allowed to use it frequently enough, Sorrells was allowed to use the phone from time to time.  *Id.* at ¶ 75(C).

Visitors were allowed once a week for fifteen minutes.  *Resp.* at ¶ 75(D).  Sorrells believes that Day turned his children away the one time they came to visit him.  *Id.*  Sorrells believes this because he was told that Day was the only one who had the authority to approve or reject a special visit.  *Id.*

On March 24, 2005, Sorrells submitted a medical request complaining of pain in his back, buttocks, legs, and testicles.  *Resp.* at ¶ 76.  He asked for an MRI.  *Id.*  He also asked if there was any progress in getting him a psychological evaluation.  *Id.*  He noted he had been waiting four months for this evaluation and had been off his medication this long.  *Id.*  He stated he was very depressed and sleeping about eighteen hours a day to get away from his thoughts.  *Id.*

In response, Sorrells was told he would see the doctor that evening.  *Resp.* at ¶ 77. Sorrells was seen by Nurse Practitioner Mayo who determined Sorrells should be seen by a urologist.  *Id.*

AO72A
(Rev. 8/82)

On March 29, 2005, a scrotum ultrasound was done at the North Arkansas Regional Medical Center. *Resp.* at ¶ 81. A less than 1 cm. in diameter low density mass was detected and the radiology report stated that a urologic consult was in order. *Id.*

An appointment was made for Sorrells to see Dr. Ferguson at the Arkansas Urology Clinic on March 31, 2005, at 10:00 a.m. *Resp.* at ¶ 80(A). Sorrells was seen by Dr. Ferguson. *Resp.* at ¶ 80(B). Surgical removal of the mass was discussed as well as possible removal of the testicle. *Id.*

On April 2, 2005, Sorrells submitted a grievance asking for a job as a trustee. *Resp.* at ¶ 82. He stated that he needed to be able to do something instead of just thinking about what he had lost. *Id.* He noted he had not received any mail from his wife in a month. *Id.* He indicated he had asked the doctor to be properly medicated. *Id.* He stated he had lost all of his reasons for living. *Id.*

In response, Sorrells was told he would be kept in mind if a trustee position became open. *Resp.* at ¶ 83. He was also told Day would see if he could get Sorrells an appointment at Ozark Counseling. *Id.*

On April 7, 2005, Sorrells submitted a medical request asking to know what Dr. Mayo found in the blood samples. *Resp.* at ¶ 84. He also asked what possible tests were being scheduled at the hospital in the next few weeks. *Id.*

In response, Mayo discussed the situation with Sorrells and told him the labs were still pending. *Resp.* at ¶ 85. Mayo also stated she would continue to follow up with Dr. Ferguson. *Id.*

AO72A
(Rev. 8/82)

Sorrells transported to the Arkansas Department of Correction (ADC) on April 18, 2005. *Resp.* at ¶ 86. When Sorrells had his intake physical at the ADC, he complained of chronic neck and back trouble, prostate problems, a diagnosis of a tumor to the right testicle, mental illness (depressed childhood), hypertension, reflux disease, a rash (of six months durations), arthritis, and prostate cancer. *Defts' Ex.* 3 at pages 2 to 5.

Sorrells was examined by ADC medical staff and prescribed Tylenol, Ranitidine, Motrin, and Atenolol. *Resp.* at ¶ 89. He was placed on field utility and got ten minute breaks every hour along with water breaks. *Id.* at ¶ 90.

On June 13, 2005, the BCDC was inspected by the State Detention Facility Review Committee. *Defts' Ex.* 5. The jail was found to be in compliance with almost all jail standards with the exception of the standards dealing with sufficient staffing, separation of prisoners, the booking area not being secured, and not having enough space for an activity room and for jail administration. *Id.* A note was made that BCDC was the state's cleanest and best run jail. *Id.* at page 8.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth

-22-

specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."

*National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### III. DISCUSSION

Defendants have now moved for summary judgment. First, defendants argue they are sued in their official capacities only. As there is no evidence of any custom or policy of Boone County that was a moving force behind any alleged violation of plaintiff's constitutional rights, they contend there is no basis on which they can be held liable under § 1983. Second, defendants argue that the facts set forth in the light most favorable to the plaintiff fail to establish that they violated the plaintiff's constitutional rights. Finally, defendants argue the claims should be dismissed because the plaintiff can offer no proof of physical injury as required by the Prison Litigation Reform Act.

#### *Official Capacity v. Individual Capacity Claims*

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendants acted under color of state law and that they violated a right secured by the

-23-

Constitution. *West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); *Dunham*

*v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be intentional; mere

negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983.

*Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Davidson v. Cannon*,

474 U.S. 344, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986).

Under § 1983, a defendant may be sued in either his individual capacity, or in his official

capacity, or claims may be stated against a defendant in both his individual and his official

capacities. In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the

distinction between individual and official capacity suits. As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those
> in their official capacities as to the type of conduct that is actionable and as to the
> type of defense that is available. *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358,
> 116 L. Ed. 2d 301 (1991). Claims against individuals in their official capacities
> are equivalent to claims against the entity for which they work; they require proof
> that a policy or custom of the entity violated the plaintiff's rights, and the only
> type of immunity available is one belonging to the entity itself. *Id.* 502 U.S. at
> 24-27, 112 S. Ct. at 361-62 (1991). Personal capacity claims, on the other hand,
> are those which allege personal liability for individual actions by officials in the
> course of their duties; these claims do not require proof of any policy and
> qualified immunity may be raised as a defense. *Id.* 502 U.S. at 25-27, 112 S. Ct.
> at 362.

*Gorman*, 152 F.3d at 914.

The Eighth Circuit has advised plaintiffs to specifically plead whether government agents

are being sued in their official or individual capacities to ensure prompt notice of potential

personal liability. *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989). *See also Andrus v.*

*Arkansas*, 197 F.3d 953 (8th Cir. 1999)(In actions against officers specific pleading of individual

capacity is required to put public officials on notice they will be exposed to personal liability).

When the plaintiff fails to state whether he is suing an official in his individual capacity, the

-24-

Eighth Circuit has construed the claim to be against the official in his official capacity only. *See*

*Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999)("[I]n order to sue a public

official in his or her individual capacity, a plaintiff must expressly and unambiguously state so

in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official

capacity."); *Egerdahl v. Hibbing Community College*, 72 F.3d 615, 620 (8th Cir. 1995)("*Nix*

requires that a plaintiff's complaint contain a clear statement of her wish to sue defendants in

their personal capacities. Neither a cryptic hint in a plaintiff's complaint nor a statement made

in response to a motion to dismiss is sufficient.").

At the same time, we are charged with liberally construing pro se complaints. *See e.g.*

*Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006)(requirement that pro se complaints be

construed even more liberally than counseled pleadings); *White v. Wyrick*, 530 F.2d 818, 819 (8th

Cir. 1976)(finding pro se petition should be "interpreted liberally and . . . should be construed

to encompass any allegation stating federal relief"). In responding to the summary judgment

motion, Sorrells has noted that he intended to sue the defendants in both their individual and

official capacities. *Resp.* at ¶ 99. As plaintiff is proceeding pro se and is incarcerated, we will

construe this as a motion to amend his complaint to assert both individual and official capacity

claims against the defendants. *See e.g., Murphy v. Arkansas*, 127 F.3d 750, 755 (8th Cir.

1997)(complaint against state officials who were sued in their official capacities was deemed

amended to assert personal capacity claims, where plaintiff moved to amend complaint in

response to motion for summary judgment).

AO72A
(Rev. 8/82)

### *Unconstitutional Conditions of Confinement*

In this case, it is not clear when during his incarceration at the BCDC that Sorrells' status changed from that of a pretrial detainee to a convicted prisoner. Sorrells was asked when during his incarceration at the BCDC he was convicted or a crime or started serving a sentence. *See Resp.* at ¶ 87. He responded: "Yes, I was being held on pending charges, & I did indeed start serving a sentence on aggravated robbery." *Id.* He failed to provide the court with the date of his conviction. As it is unclear when his status changed, we will treat Sorrells as a pretrial detainee for purposes of this summary judgment motion.

Pretrial detainees are "outside the protections of the Eighth Amendment proscription against cruel and unusual punishment, which applies only to convicted prisoners." *Hott v. Hennepin County, Minnesota*, 260 F.3d 901, 905 (8th Cir. 2001). Instead, pre-trial detainees are protected by the Fourteenth Amendment guarantees. *Id.* "The Fourteenth Amendment guarantees pre-trial detainees at least as many protections as does the Eighth Amendment, however, and extends to them as well protection from deprivations that are intended to punish." *Id.*

"Conditions of pretrial confinement are impermissible if they constitute punishment as determined by the due process standards of the Fifth and Fourteenth Amendments." *Ferguson v. Cape Girardeau County*, 88 F.3d 647, 650 (8th Cir. 1996)(*citing, Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)). *See also Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994)(*citing Davis v. Hall,* 992 F.2d 151, 152 (8th Cir. 1993) and *Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)). "[A] pretrial detainee faces a lighter burden to show a constitutional violation than [that required of a convicted person] under

-26-

the Eighth Amendment." *Smith v. Copeland*, 87 F.3d 265, 268 n. 4 (8th Cir. 1996)(*citing Bell*, 441 U.S. at 537 n. 16 (due process requires that a pretrial detainee not be punished; the Eighth Amendment requires that the punishment imposed not be cruel and unusual)).

In elaborating on the appropriate standard to be applied to conditions of confinement claims brought by pretrial detainees, the Eighth Circuit in *Smith* said:

> The proper inquiry is whether those conditions amount to punishment of the detainee, for, under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt. However, not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." The Government has legitimate interests that stem from its need to manage the facility in which the individual is detained. Furthermore, there is a *de minimis* level of imposition with which the Constitution is not concerned.

*Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996)(citations omitted).

In evaluating conditions of confinement claims, the court is to "look to a number of factors, including the size of the detainee's living space, the length of the confinement, the amount of time spent in the confined area each day, and the opportunity for exercise." *Ferguson v. Cape Girardeau County*, 88 F.3d 647, 650 (8th Cir. 1996). The conditions are to be viewed in the totality of the circumstances. *Id.*

### (a). General Complaints & Overcrowding

Sorrells contends he was subjected to the following conditions: inadequate and over-worked personnel; lack of hot and cold water; inadequate hygiene supplies; improper separation of prisoners; no separation of mentally ill prisoners; and lack of space. *See e.g., Resp.* at ¶ 92. Sorrells also contends the facility was overcrowded. *See e.g., Resp.* at ¶ 92.

"[O]vercrowding alone is insufficient to create a due process violation." *A.J. by L.B. v. Kierst*, 56 F.3d 849, 854 (8th Cir. 1995). *See Patchette v. Nix*, 952 F.2d 158, 162 (8th Cir.

-27-

1991)(plaintiff has not alleged "overcrowding led to deprivations of essential food, medical care, or sanitation, nor increased violence among inmates or other conditions intolerable for prison confinement")(*citing Cody v. Hillard*, 830 F.2d 912, 914 (8th Cir. 1987)). *See also Kost v. Kozakiewicz*, 1 F.3d 176 (3d Cir. 1993)(using an Eighth Amendment standard to evaluate the claims of a pretrial detainee even though his rights arose under the due process clause of the Fourteenth Amendment rather that under the Eighth Amendment); *accord Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994).

Here, Sorrells has not alleged that the "overcrowding led to deprivations of essential food, medical care, or sanitation." *Patchette v. Nix*, 952 F.2d 158, 162 (8th Cir. 1991)(*citing Cody v. Hillard*, 830 F.2d 912, 914 (8th Cir. 1987)). *See also Kost v. Kozakiewicz*, 1 F.3d 176 (3d Cir. 1993)(using an Eighth Amendment standard to evaluate the claims of a pretrial detainee even though his rights arose under the due process clause of the Fourteenth Amendment rather that under the Eighth Amendment); *accord Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994). Sorrells received three meals a day. *Resp.* at ¶ 72(A). He was able to exercise in his cell, occasionally had use of a day-room, and after February was able to go outside. *Resp.* at ¶ 21(B) & ¶ 19(B). He was able to shower three times a week and with the exception of three occasions had adequate hygiene supplies. *Resp.* at ¶ 19(B) & ¶ 24(D). While Sorrells was involved in an altercation with another inmate, Freeman, there is no indication the altercation was the result of overcrowding rather than ill feelings between the two. *Resp.* at ¶ 29-¶ 33.

Sorrells' basic human needs for food, clothing, and shelter were met. A *de minimis* level of imposition does not rise to the level of a constitutional violation. *Bell v. Wolfish*, 441 U.S. 520, 539 n. 21, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). *See also Wilson v. Seiter*, 501 U.S. 294, 305-05, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)("Nothing so amorphous as 'overall conditions'

-28-

can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists.").

**(b). *Exercise***

A constitutional violation exists if prison officials are deliberately indifferent to an inmate's exercise needs. *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992). A "lack of exercise may be a constitutional violation if one's muscles are allowed to atrophy or if an inmate's health is threatened." *Id.* Among factors the court should consider in reviewing such a claim are: (1) the opportunity to be out of the cell; (2) the availability of recreation within the cell; (3) the size of the cell; and (4) the duration of confinement. *Id.*

Here, Sorrells concedes there was adequate room in his cell to do exercises such as push-ups, sit-ups, crunches, and back arm extensions. *Resp.* at ¶ 21(B). He also concedes he had occasional access to the day-room. *Resp.* at ¶ 19(B). While Sorrells may not have been allowed to go outside to exercise for a period of time, in his own words primarily because of the weather, he could exercise in his cell, this amount of exercise does not demonstrate a deprivation sufficiently serious to establish deliberate indifference to Sorrells' health or safety. *Rahman X v. Morgan*, 300 F.3d 970, 974 (8th Cir. 2002). *See Phillips v.* Norris, 320 F.3d 844, 847 (8th Cir. 2003)(thirty-seven days without being allowed to exercise did not constitute an atypical and significant hardship in the context of normal prison life); *Delaney v. DeTella*, 256 F.3d 679, 684 (7th Cir. 2001)("short-term denials of exercise may be inevitable in the prison context."); *Leonard v. Norris*, 797 F.2d 683, 685 (8th Cir. 1986)(fifteen days of no out-of-cell exercise not cruel and unusual punishment); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992)(45 minute out-of-cell recreation time per week did not violate the Eighth Amendment rights of inmate in protective custody). While Sorrells alleges he suffered physical injury as a result of the lack of

-29-

exercise, the physical injuries he identifies are hypertension, shortness of breath, and occasional neck pain. *See Resp.* at ¶ 21(C). These are the same conditions he maintains were caused by the diet he was given, the attack by Freeman, and the denial of medical care. These are also the same conditions for which he sought medical treatment throughout his incarceration at the BCDC. We believe defendants are entitled to judgment in their favor on this claim.

### *(c). Diet*

Both the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment's prohibition against cruel and unusual punishment require prisoners to be provided with meals nutritionally adequate to maintain health. *See e.g., Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980)(prisoners are guaranteed a reasonably adequate diet). Merely because the food is not prepared to an inmate's taste or the fact that an inmate would prefer other foods does not implicate the Constitution. Rather, the Constitution is only violated if the food provided is inadequate to maintain good health. *See e.g., Burgin v. Nix*, 899 F.2d 733, 734-35 (8th Cir. 1990)(inmates do not have a right to be served a particular type of food). *See also Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)(the deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the minimal civilized measure of life's necessities).

Here, Sorrells contends the food contained too much starch and sodium and was not good for his health in view of his hypertension. However, there is no indication that any medical person ever placed Sorrells on a low fat/low sodium or other therapeutic diet or that the personnel at the BCDC ignored a request from medical personnel that Sorrells be put on such a diet. In fact, there is no indication Sorrells made any request of medical personnel to be placed on such a diet.

-30-

There is no indication Sorrells his health was endangered because of the manner in which the food was prepared or served. The menus at the BCDC were approved by a dietician. *Defts' Ex.* 1 at page 42. On the facts before us, no claim of constitutional dimension is stated.

### Access to Legal Materials or the Courts

"Inmates undeniably enjoy a constitutional right of access to the courts and the legal system." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996)(*citing*, *Lewis v. Casey*, 518 U.S. 343, ----, 116 S. Ct. 2174, 2179, 135 L. Ed. 2d 606 (1996); *Bounds v. Smith*, 430 U.S. 817, 821, 97 S. Ct. 1491, 1494-95, 52 L. Ed. 2d 72 (1977)). In *Myers,* the Eighth Circuit stated that:

> [t]o protect that right, prisons must provide inmates with some access to legal materials or to legal assistance so that inmates can prepare and pursue complaints, and with some ability to mail these complaints and related legal correspondence once prepared. Inmates do not have a right, however, either to law libraries or to unlimited stamp allowances for legal mail. Instead, the duty to make such arrangements is bounded by the inmates' right of meaningful access to the courts. To state a claim that a law library or legal assistance program violates this right, inmates must assert that they suffered an actual injury to pending or contemplated legal claims. Alleging theoretical inadequacies is insufficient. Inmates must instead show, for example, that a complaint that they prepared was dismissed due to a technical requirement that a library's inadequacies prevented them from knowing, or that a library was so inadequate that it prevented them from filing a complaint for actionable harm at all.

*Myers*, 101 F.3d at 544 (citations omitted). *Cf. Kane v. Garcia Espitia*, ___ U.S. ___, 126 S. Ct. 407, 408 (Oct. 31, 2005)(per curiam)(Habeas corpus case. No clearly established federal law establishing a *pro se* criminal defendant's right of access to a law library. *"Faretta* [*v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)] says nothing about any specific legal aid that the State owes a *pro se* criminal defendant.").

In *Cody v. Weber*, 256 F. 3d 764 (8th Cir. 2001), the Eighth Circuit noted that the Supreme Court in *Lewis v. Casey*, 518 U.S. 343, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996) and *Bounds v. Smith*, 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977), "determined that the right

-31-

of access to the courts guarantees an inmate the ability to file lawsuits that directly or collaterally attack the inmate's sentence or that challenge the conditions of the inmate's confinement, but it does not extend to the right to 'discover grievances' or to 'litigate effectively once in court.'" *Cody*, 256 F. 3d at 767-68 (*quoting Lewis*, 518 U.S. at 354-55).

Although "[p]ro se defendants have a right of access to adequate law libraries or adequate assistance from persons trained in the law," *United States v. Knox*, 950 F.2d 516, 519 (8th Cir. 1991)(quotations omitted), the right is not an abstract one and the inmate must "demonstrate that the alleged shortcomings . . . hindered his efforts to pursue a legal claim." *Lewis*, 518 U.S. at 351. *See also Kind v. Frank*, 329 F.3d 979, 981 (8th Cir. 2003)("Actual injury or prejudice must be proven to prevail on an access-to-courts claim."). In this case, Sorrells' claim stemming from his lack of access to a law library or legal materiels fails because he has suffered no actual injury.

While Sorrells alleges that he was unable to file a motion for change of venue and could not subpoena his brother, Sorrells had an attorney representing him in his criminal case. *Resp.* at ¶ 9(E). Sorrells was able to consult with his attorney. Sorrells was able to send and receive legal mail, he could phone his attorney, and his attorney was free to visit him at the BCDC. *Resp.* at ¶ 9(J), ¶ 9(K), and ¶ 9(L). Sorrells discussed filing the motion and his request for his brother to be subpoenaed with his attorney and his attorney, in the exercise of his judgment, concluded these actions should not be taken. *Resp.* at ¶ 9(F) & ¶ 9(H). Sorrells did not miss any deadlines for filing any documents or claims with the court. His allegations are insufficient as a matter of law.

### Denial of Medical Care

As a pretrial detainee, Sorrells' denial of medical care claims are more properly analyzed under the due process clause of the Fourteenth Amendment than the Eighth Amendment.

-32-

*Hartsfield v. Colburn*, 371 F.3d 454, 456-457 (8th Cir. 2004). "The standard to be applied in assessing a pretrial detainee's claim of due process violations . . . is not entirely clear." *Spencer v. Knapheide Truck Equipment Co.*, 183 F.3d 902, 906 (8th Cir. 1999)(citation omitted). Nevertheless, "[t]he Supreme Court has held that pretrial detainees are entitled under the Fourteenth Amendment to 'at least as great' protection as that afforded convicted prisoners under the Eighth Amendment." *Id.* (*quoting City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983).

In the absence of a clearly binding standard, the Eighth Circuit in analyzing inadequate medical care claims brought by pretrial detainees has applied the Eighth Amendment's deliberate indifference standard. *See e.g., Hartsfield*, 371 F.3d at 456-457; *Spencer,* 183 F.3d at 905-06; *Hall v. Dalton*, 34 F.3d 648, 650 (8th Cir. 1994)(analyzing a pretrial detainee's claim of inadequate medical care under the deliberate indifference standard). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)). *See also Gregoire v. Class*, 236 F.3d

-33-

413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

*Dulany*, 132 F.3d at 1239. *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

Sorrells maintains it was only after Dr. Ferguson indicated Sorrells needed surgery that his trial date was moved from August of 2005 to March of 2005. *Resp.* at ¶ 96. Sorrells suggests

-34-

Sheriff Hickman was behind this. *Id.* With respect to Nurse Practitioner Mayo, Sorrells contends she failed to ensure he was placed on a low sodium, low fat diet, and allowed BCDC to send him to the ADC without him having surgery first. *Id*. at ¶ 97. Now he is at the ADC, Sorrells indicates he will have to wait until he finishes serving his sentence to have the surgery because the ADC will not pay for surgery unless the condition involved is life threatening. *Id. See also Resp.* at ¶ 98.

Here, there is nothing that suggests Mayo ignored an acute or escalating condition, or that Sorrells had a "life-threatening condition or an urgent medical condition that was exacerbated by delay." *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997)(citations omitted). *See Dulany v. Carnahan,* 132 F.3d 1234, 1243 (8th Cir.1997) (holding that the "objective portion of the deliberate indifference standard requires a showing of 'verifying medical evidence' that the defendants ignored an acute or escalating condition or that delays adversely affected prognosis"). Sorrells was seen by Mayo on several occasions, sent to the hospital for evaluation following the altercation with Freeman, and referred to a urologist when he continued to experience pain and symptoms in his testicle. Sorrells makes no argument that he did not receive all treatment ordered by the medical personnel.

Instead, Sorrells primary objection is that he was transferred to the ADC prior to Dr. Ferguson scheduling and performing surgery on Sorrells. While Sorrells maintains Sheriff Hickman was somehow behind the speed with which Sorrells trial date came up and the speed with which he was transferred to the ADC, Sorrells has offered nothing to support his bare assertion.

-35-

Moreover, there is no suggestion Sheriff Hickman interfered in Sorrells medical care or influenced in anyway the medical care given to Sorrells.

While multiple contacts with medical personnel do not necessarily preclude a finding of deliberate indifference, *see Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001), it is clear that in this case Sorrells received medical treatment on multiple occasions and defendants did nothing to interfere with, or delay, the ordered treatment. While Sorrells suggests he should have been treated more aggressively or more quickly, a conservative course of treatment does not demonstrate deliberate indifference. *See e.g., Bellecourt v. United States*, 994 F.2d 427, 431 (8th Cir. 1993). Moreover, all decisions about necessary medical treatment and care were made by medical personnel and Sorrells received all treatment ordered by medical personnel. There is no evidence of deliberate indifference on Mayo's part.

Sheriff Hickman did not make any decisions about the medical care Sorrells should receive. *Resp.* at ¶ 30. *See Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997)(prison official not involved in treatment decisions made by medical staff cannot be liable for medical staff's diagnostic decisions). There is simply no basis on which the Sheriff can be held liable. We find no genuine issues of material fact exist as to whether the defendants were deliberately indifferent to Sorrells' serious medical needs.

### Failure to Protect

Due process 'protects pretrial detainees both from deliberate exposure to violence and from failure to protect when prison officials learn of a strong likelihood that a prisoner will be assaulted.'" *Anderson v. Gutschenritter*, 836 F.2d 346, 349 (7th Cir. 1988). Similarly, the

-36-

Eighth Amendment imposes a duty on the part of prison officials to protect convicted prisoners

from violence at the hands of other prisoners. *Perkins v. Grimes*, 161 F.3d 1127, 1129 (8th Cir.

1998). In addressing failure to protect claims brought by pretrial detainees, the Eighth Circuit

has noted that the pretrial detainees are entitled to at least as much protection as a convicted

inmate and has applied Eighth Amendment analysis to claims brought both by pretrial detainees

and convicted prisoners. *Perkins*, 161 F.3d at 1129- 1130. *See also Thomas v. Booker*, 784 F.2d

299 (8th Cir. 1986)(analyzing a pretrial detainee's failure to protect claim under the same Eighth

Amendment analysis used for similar claims brought by prisoners.).

> In *Riley v. Olk-Long*, 282 F.3d 592 (8th Cir. 2002), the court stated:

> An Eighth Amendment claim for failure to protect is comprised of two elements.
> First, an "inmate must show that [he] is incarcerated under conditions posing a
> substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).
> Second, the inmate must establish that the defendant prison official recklessly
> disregarded that risk. *Jackson v. Everett*, 140 F.3d 1149, 1151 (8th Cir. 1998).
> "For the purposes of failure to protect claims, it does not matter ... whether a
> prisoner faces an excessive risk of attack for reasons personal to [him] or because
> all prisoners in [his] situation face such a risk." *Hott v. Hennepin County, Minn.*,
> 260 F.3d 901, 906 (8th Cir. 2001) (internal quotations omitted). The question is
> whether a prison official has a "sufficiently culpable state of mind," meaning that
> [he] is deliberately indifferent to an inmate's safety. *Farmer*, 511 U.S. at 834
> (internal quotation omitted). The prison official's state of mind is measured by a
> subjective, rather than an objective, standard. *Id.* at 838-39; *see also Jackson*, 140
> F.3d at 1152 ("[D]eliberate indifference must be viewed from [defendants']
> perspective at the time in question, not with hindsight's perfect vision."). "[T]he
> official must both be aware of facts from which the inference could be drawn that
> a substantial risk of serious harm exists, and [he] must also draw the inference."
> *Farmer*, 511 U.S. at 837.

*Riley*, 282 F.3d at 595. *See also Krein v. Norris*, 309 F.3d 487 (8th Cir. 2002)

Thus, to prevail, Sorrells must show: (1) that his incarceration with Freeman posed a substantial risk of serious harm, and (2) each of the defendants knew of and disregarded an excessive risk to Sorrells' safety. *Pagels v. Morrison*, 335 F.3d 736, 740 (8th Cir. 2003).

To establish the second component, Sorrells must show that each defendant acted, or failed to act, with deliberate indifference to Sorrells' safety. *Id.* Negligence is not sufficient. *Id.* Even if the conduct was unreasonable, this is not enough because "reasonableness is a negligence standard." *Id.* at 742 (internal quotation marks and citation omitted). Further, the United States Court of Appeals for the Eighth Circuit has noted that "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Id.* at 740-741 (internal quotation marks and citation omitted).

In *Perkins v. Grimes*, 161 F.3d 1127 (8th Cir. 1998), the district court "agreed that defendants were on notice that Wilson was a disruptive inmate," but found defendants "had no notice that Wilson posed a threat of serious injury to Perkins because Perkins did not effectively alert them that he faced such a threat." *Id.* at 1130. Further, the district court found that "the defendants periodic cell checks yielded no information that would have put them on such notice." *Id.* The Eighth Circuit found no clear error. *Id.* It noted that "[a]lthough the testimony indicated that Wilson was an easily provoked detainee, the evidence also shows that Perkins and Wilson had previously been housed together without incident and that Perkins' jailers neither knew, or had reason to know, that Wilson was a violent sexual aggressor, either on this or on a previous occasion." *Id.*

-38-

In this case, we believe defendants are entitled to summary judgment on this claim. Prior to fight between Sorrells and Freeman, Freeman had not threatened Sorrells in anyway. *Resp. at ¶ 33(A) & ¶ 33(B).* Nothing before the court suggests Freeman has a previous history of violent attacks on inmates or that there was any reason to suspect an attack was going to occur. There is simply insufficient evidence to establish there are genuine issues of material fact as to whether Sorrells was incarcerated under conditions posing a substantial risk of serious harm and as to whether defendants recklessly disregarded the risk.

## IV. CONCLUSION

I recommend that the complaint be considered to be amended to be asserting both individual and official capacity claims against each defendant. Further, I recommend that the defendants' motion for summary judgment be granted and this case be dismissed.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 8th day of June 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)